UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **MARK E. DOTTORE,** | : | **Case No. 1:09-CV-2636** |
| Plaintiff, | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| v. | : | |
| **THE HUNTINGTON NATIONAL BANK,** | : | **MEMORANDUM AND ORDER** |
| Defendant. | : | |

Before the Court is Defendant The Huntington National Bank's ("Huntington") Motion to Compel Arbitration. (Doc. 4.) Plaintiff Mark E. Dottore ("Dottore") filed a brief in opposition to that motion (Doc. 6), Huntington filed a reply (Doc. 7), and both parties filed sur-reply briefs with leave of the Court (Docs. 9, 15, 16). As explained below, Huntington's Motion to Compel Arbitration (Doc. 4) is **DENIED**.

### I. PROCEDURAL HISTORY

The facts giving rise to this litigation are described in a related action. *See Gordon v. Dadante*, Case No. 1:05cv2726, 2009 U.S. Dist. LEXIS 54147, at *8-72 (N.D. Ohio June 26, 2009). For present purposes, it is most relevant to understand that Dottore is the Receiver for an entity known as the IPOF Fund. The IPOF Fund, although marketed as a legitimate investment fund, was actually a Ponzi Scheme operated by David Dadante. In the action before the Court, Dottore alleges that Huntington breached its duty of care to IPOF Fund investors and aided Dadante's fraud. (Doc. 1.)[1]

---

[1] Specifically, Dottore alleges that, as the result of a merger, Huntington is the successor-in-interest to Sky Bank, and that Sky Bank breached its duty of care to IPOF Fund investors and aided

On January 8, 2010, Huntington moved this Court to compel arbitration. (Doc. 4.)

## II. LEGAL STANDARD

In analyzing a motion to compel arbitration, a "court 'must determine whether the dispute is arbitrable, meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of the agreement.'" *Mazera v. Varsity Ford Mgmt. Servs., LLC*, 565 F.3d 997, 1001 (6th Cir. 2009) (quoting *Landis v. Pinnacle Eye Care, LLC*, 537 F.3d 559, 561 (6th Cir. 2008)). Although "the interpretation of an arbitration agreement is generally a matter of state law, the [Federal Arbitration Act] imposes certain rules of fundamental importance . . . ." *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1773 (2010) (citations omitted). These rules include "the basic precept that arbitration 'is a matter of consent, not coercion,' *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)." *Id.* Still, "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options v. Kaplan*, 514 U.S. 938, 944 (1995). Under Ohio law, "[w]hen there is a question as to whether a party has agreed to an arbitration clause, there is a presumption against arbitration." *Maestle v. Best Buy Co.*, 2005 Ohio 4120, ¶22 (Ohio Ct. App. Aug. 11, 2005) (citations omitted).

## III. FACTUAL BACKGROUND

In 2001, Dadante opened accounts at two banks, Metropolitan Bank and Trust Company ("Metropolitan") and Great Lakes Bank ("Great Lakes"). (Doc. 7 at 3.) No party has a copy of the agreements signed by Dadante at the time he opened these accounts. (*See* Doc. 15 at 2 ("[D]espite Huntington's best efforts, Huntington cannot locate the original account agreements from Great Lakes Bank and Metropolitan Bank . . . .").) Accordingly, as explained by Huntington, "it is not possible to

---

Dadante's fraud. (Doc. 1.) For clarity, the Court will refer to "Huntington" throughout this opinion, although the relevant facts occurred at what was then known as Sky Bank.

determine the scope of the amendments permitted by [the Great Lakes or Metropolitan] agreements." (*Id.*) Both parties seem to agree, however, that neither agreement contained an arbitration provision.

In 2003, both Great Lakes and Metropolitan "merged into" Huntington. (Doc. 7 at 3.) In connection with these mergers, Huntington sent notices to all customers explaining that:

> **In some cases, changes have been made to the terms of your account**. Please refer to your enclosed Welcome catalog for an overview and the Account Rules and Regulations booklet for more details. Within the booklet see the Fee Schedule and the new Funds Availability Disclosure for information about new fees, transaction access, and funds availability for your business and personal accounts.

(Doc. 7-3) (bold in original). That booklet contained an arbitration provision. It also included the following paragraph: "maintaining an Account acknowledges receipt of the Agreement [and your agreement] to be bound by the terms set forth in the Agreement, as amended from time to time." (Doc. 4-2 at 4.)

In 2005, after Dadante's fraud came to light, but before the Receiver was appointed, Frank Regalbuto, acting on behalf of the IPOF Fund, filed a change of signature card with Huntington, substituting himself for Dadante on the IPOF account. The document signed by Regalbuto stated that it was his "Permanent" account agreement. (Doc. 6-1 at 1.) It continued:

> YOUR DEPOSIT ACCOUNT TERMS AND CONDITIONS. AGREEMENT – These terms govern the operation of this account unless varied or supplemented in writing. . . .
>
> Much of our relationship with our deposit customers is regulated by state and federal law . . . . The purpose of this form is to:
> (1) summarize the rules applicable to the more common transactions
> (2) establish rules to govern transactions or circumstances which the law does not regulate; and
> (3) establish rules for certain events or transactions which the law regulates but permits variation by agreement.
> We may permit some variations from this standard agreement, but variations must be agreed to in writing . . . .

(Doc. 6-1 at 2.) This document contains a section with the heading "LIABILITY," but neither this section nor any other portion of the document contains an arbitration provision, nor does this document purport to incorporate other past documentation by reference.

3

**IV. ANALYSIS**

**A. Whether the 2003 Notice Created an Enforceable Arbitration Agreement**

The threshold question is whether the "Account Rules and Regulations" sent to Dadante in 2003 ("2003 Notice") acted to create an enforceable arbitration agreement, a question answered under Ohio law. *See First Options*, 514 U.S. at 944. It appears that only one court within Ohio has considered this question, and that court held that a financial institution may not add an arbitration agreement "through a change-in-terms provision when the initial agreement does not contain any terms regarding dispute resolution." *Maestle*, 2005 Ohio 4120 at ¶15.

In *Maestle*, the Eighth Appellate District asked "whether an arbitration clause may be unilaterally added" to a contract that did not contemplate such a clause from its inception. *See Maestle*, 2005 Ohio 4120 at ¶15. It concluded that "a party with a unilateral right to modify a contract [does not have] the right to make any kind of change whatsoever . . . ." *Id* at ¶ 20 (emphasis added). Rather, a party may only modify a contract in a manner consistent with the original expectations of the parties. *See id*. at ¶ 25.[2] Based on this principle, the court in *Maestle* explained that an arbitration provision added to a credit card agreement was unenforceable because it was unanticipated by the original contract

---

[2] Huntington seeks to distinguish this portion of *Maestle*:

> Critical to the court's holding in *Maestle* was the language regarding the scope of the amendment provision in the original agreement and whether or not that provision could be understood to include an amendment to add an arbitration provision in the revised agreement. Here, despite Huntington's best efforts, Huntington cannot locate the original account agreements from Great Lakes Bank and Metropolitan Bank, and therefore it is not possible to determine the scope of the amendments permitted by those agreements. Therefore, the holding in *Maestle* is of limited utility to this Court's determination of the issue presently before it.

(Doc. 15 at 2.) The problem with Huntington's argument is that it essentially asks the Court to assume that Dadante executed a broadly worded agreement in 2001 – and that *Maestle's* holding does not apply therefore – simply because Huntington cannot locate that agreement. Given that "[w]hen there is a question as to whether a party has agreed to an arbitration clause, there is a presumption against arbitration," it would seem that the Court should draw the opposite conclusion. *Maestle*, 2005 Ohio 4120 at ¶22.

4

between the parties. *Id.* ("There was no indication . . . that [a] subsequently issued policy would contain an arbitration provision.").

While *Maestle* is not binding, it is a thorough opinion, and this Court is hesitant to conclude that a state appellate court does not understand its own law when no other state court ruling is to the contrary. It is true, however, that other states appear to analyze this question differently. *See, e.g.*, *Stinger v. Chase Bank, USA*, 265 Fed. Appx. 224, 226 (5th Cir. 2008) ("Stinger continued to use the MasterCard after the effective date of the amendments."); *Walters v. Chase Manhattan Bank*, Case No. 07-0037, 2008 U.S. Dist. LEXIS 60675, at *7 (E.D. Wash. Aug. 6, 2008) ("Plaintiff did not object to the arbitration clause after receipt of the notice, and Plaintiff continued to use the account after being notified of the arbitration agreement. Based on the foregoing facts, it is apparent that Plaintiff agreed to binding arbitration."). Even setting aside that these decisions did not involve Ohio law, it is possible to harmonize *Maestle* with some of these decisions because many of these decisions refer to a specific notice that *highlighted* the addition of an arbitration provision. In *Maestle*, on the other hand, it is not clear that the notice of change in terms explained the existence or purpose of the new arbitration provision. In other words, it is possible to read *Maestle* to hold that a <u>general</u> notice of a change in terms is only effective if the changes are of the type contemplated by the original contract. Even if *Maestle* were so limited, however, that limitation would not control the outcome here, because there is no dispute that the change of terms notice upon which Huntington seeks to rely was a general one.

If this case also involved a credit card, accordingly, there is little question this Court would be compelled to follow *Maestle*, even if it has some doubts regarding its wisdom. There is, however, one critical difference between this case and *Maestle*: this case involves a deposit account. As Huntington notes, deposit accounts are governed by a provision of the Ohio Revised Code that does not apply to credit cards and, consequently, that was not analyzed in *Maestle*:

> At the time of opening a deposit account, a bank shall provide the depositor a statement containing the existing terms and conditions of the deposit contract. The statement may

> be set forth on the depositor's signature card. Before effecting any change in the terms and conditions of a deposit contract, a bank shall send written notice of the change to each depositor with whom the bank has a deposit contract of the kind to be changed. <u>Depositors and any other owners of interests in deposit accounts shall be bound by all changes banks make in their deposit contracts</u>.

O.R.C. § 1109.05(B) (emphasis added). Huntington argues that this provision entitles it to make any change whatsoever, regardless of the holding in *Maestle*.

The Court is not entirely convinced by Huntington's arguments on this point for a few reasons. First, to the extent that *Maestle* can be read as standing for the proposition that a broadly worded change in terms notice is ineffective to function as notice under Ohio law, such reasoning would be equally applicable here. Second, the "changes" referenced in O.R.C. § 1109.05(B) could be read as referring only to changes to *existing* terms, rather than the addition of wholly *new* terms: the statute could have been written to refer to "changes or additions," but it was not. Third, the Court in *Maestle* explained a principle of contract interpretation in Ohio that does not seem abrogated by the above language: "a party with a unilateral right to modify a contract [does not have] the right to make any kind of change whatsoever . . . ." *Maestle*, 2005 Ohio 4120 ¶20. Were the Court required to do so, then, it would conclude that *Maestle* applies to deposit accounts as well as credit cards and that *Maestle* represents the only clear statement of Ohio law on the subject.[3] As explained below, however, the Court need not reach this question.

**B. Whether the 2005 Agreement Eliminated any Arbitration Provision**

Dottore argues that, even assuming the 2003 Notice created an enforceable arbitration provision, the "Permanent" "account agreement" ("2005 Agreement"), which contained no mention of arbitration

---

[3] Based on these conclusions, the Court would consider the possibility of certifying this question to the Supreme Court of Ohio for dispositive resolution if it were necessary for the disposition of the pending motion.

and did not purport to incorporate any previously existing documents by reference, acted to eliminate the 2003 provision. Huntington responds:

> [T]his is not an account opening document, but rather a change of signature document. Furthermore, there is nothing in this document that negates the applicability of the Sky Bank Account Rules and Regulations. The sole purpose of the form was to change the signatures required for conducting transactions on the account, not the nature of the account nor the rules governing the account. As O.R.C. §1109.05 makes clear, only at the time of opening, must a bank provide the account terms and conditions to its customers.

(Doc. 7 at 8n.1; *see also* Doc. 15 at 4.)

Huntington's arguments are poorly taken. First, it defies reason to hold that Huntington may bind its customers through notices in the mail that their customers need never sign, yet is not itself bound by a "Permanent" "account agreement" that customers *do* sign. (Doc. 6-1 at 1.) Second, the 2005 Agreement is in every respect a fully self-contained document that "establish[es] rules for certain events or transactions which the law already regulates but permits variation by agreement." (Doc. 6-1 at 2.) It does not purport to incorporate any other past document by reference, to the contrary; it states that it "govern[s] the operation of the account unless varied or supplemented in writing." (*Id.*)[4] Third, the Court cannot credit Huntington's attempt to argue that the document was not intended to change "the rules governing the account." The document says that it is a "Permanent" "account agreement" that contains the "ACCOUNT TERMS AND CONDITIONS." (Doc. 6-1 at 1-2.) Accordingly, that is what the Court construes it to be: a permanent agreement containing the terms that govern the account.

---

[4] Although basic principles of contract interpretation compel the conclusion that the 2005 Agreement eliminated the arbitration provision contained in the 2003 Notice, another point is worthy of mention. The Supreme Court of Ohio has made clear that "an arbitration clause in a consumer contract with some characteristics of an adhesion contract necessarily engenders more reservations than an arbitration clause in a different setting . . . ." *Taylor Bldg. Corp. of Am. v. Benfield*, 884 N.E.2d 12, 24 (Ohio 2008) (citation omitted); *see also Worldwide Asset Purchasing, LLC v. Easterling*, 2009 Ohio 6196, ¶ 7 (Ohio Ct. App. 2009) ("[S]ituations where the parties' agreement appears to be an adhesion contract will substantially weaken the presumption favoring arbitration." (footnote and citations omitted)). Ohio courts explain that arbitration should not be foisted upon one who does not agree to it and, thus, "[w]hen there is a question as to whether a party has agreed to an arbitration clause, there is a presumption against arbitration." *Maestle*, 2005 Ohio 4120 at ¶22.

Case: 1:09-cv-02636-CAB Doc #: 17 Filed: 09/28/10 8 of 8. PageID #: 163

Finally, the argument that state law only *requires* a bank to provide account terms and conditions when an account is opened does not change the fact that Huntington *chose to* provide detailed terms and conditions to Mr. Regalbuto in 2005 and that, to the extent there ever was a binding arbitration agreement, to remove or override that agreement in 2005. That Huntington was not *required* to provide this document does not make it any less binding.

In sum, the 2005 Agreement is the permanent account agreement that contains the terms and conditions of the account at issue in this case. Those terms and conditions appear to be complete, do not include any arbitration provision, and do not refer to any previously existing agreements. As Dottore rightly asserts, there is simply no agreement between the parties to arbitrate this dispute.

### V. CONCLUSION

For the aforementioned reasons, Huntington's Motion to Compel Arbitration (Doc. 4) is **DENIED**.

**IT IS SO ORDERED.**

                                                      s/Kathleen M. O'Malley
                                                      **KATHLEEN McDONALD O'MALLEY**
                                                      **UNITED STATES DISTRICT JUDGE**

**Dated: September 28, 2010**

8